**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE, | ) Civil Action No. 2:26-cv-213 |
| | ) |
| Plaintiff, | ) Filed Electronically |
| | ) |
| vs. | ) |
| | ) |
| BLANK ROME, LLP, | ) |
| | ) |
| Defendant. | ) **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff JANE DOE, by and through her attorneys, HORNE DALLER LLC, submits this Complaint against Defendant BLANK ROME, LLP and in support thereof avers as follows:

## INTRODUCTION

1.      Defendant Blank Rome, LLP ("Blank Rome") demonstrated a clear and decisive intention to discriminate against Plaintiff Jane Doe ("Ms. Doe")[1] on account of her sex in its failure to appropriately respond to Ms. Doe's report of sexual assault at the hands of one of its male associate attorneys ("Associate A") and her subsequent concerns regarding her health and safety.

2.      On June 1, 2024, after screaming out and hysterically crying, Ms. Doe was found by three (3) individuals lying partially naked on a bedroom floor, her head shoved under a bedframe, as the perpetrator lay fully clothed next to her.

3.      That perpetrator was Associate A.

---

[1] Ms. Doe has been personally identified to Defendant through prior communications and proceedings including, *inter alia*, the filing of her EEOC and PHRC charges.

4.     The horrific assault was immediately reported to Blank Rome by Ms. Doe and a then-Partner ("Partner A")[2] in the Pittsburgh office who was also one of the individuals who responded to Ms. Doe's pleas for help.

5.     Upon receipt of these reports, Blank Rome chose an inappropriate course of action, manipulating the circumstances into a "he said/she said" encounter, despite three (3) eyewitnesses and police involvement.

6.     Blank Rome, under the leadership of its Chief Human Resources Officer, created its own narrative of embarrassment and shame, failed to appropriately notify leadership, failed to take appropriate actions in response to the report of sexual assault, and failed to grant any of Ms. Doe's requests to be placed on a modified schedule that would keep her safe from Associate A.

7.     Blank Rome's negligence in hiring Associate A at the outset and without any proper inquiry into his past has placed the firm's attorneys and staff at risk, with Ms. Doe taking the brunt of that risk just three (3) months into Associate A's employment.

8.     After his hire, Blank Rome quickly became on notice of his erratic and concerning behaviors in the months leading up to the sexual assault and took no action to address his conduct; instead it protected him and his employment status at every opportunity and**, following her assault**, to the detriment of Ms. Doe who was subjected to ongoing retaliation.

9.     Associate A remained employed by Blank Rome for 16 months after the report of sexual assault, without appropriate consequence for his actions, subjecting Ms. Doe to a constructive discharge since she had no alternative but to leave for her own physical, mental, and emotional safety.

---

[2] Blank Rome's employees have been identified as Associate A, Partner A, Professional Assistant, etc. in this filing. However, their identities have been made available to Defendant through prior communications and proceedings including, *inter alia*, the filing of her EEOC and PHRC charges.

## PARTIES

10.     Ms. Doe is a former lawyer of Blank Rome.  At all times relevant hereto, she resided in Pittsburgh, Allegheny County, Pennsylvania 15211.

11.     Defendant Blank Rome is a law firm with a principal address of One Logan Square, 103 North 18th Street, Philadelphia, Philadelphia County, Pennsylvania 19103.  Blank Rome also maintains a local office at Union Trust Building, 501 Grant Street, Suite 850, Pittsburgh, Allegheny County, Pennsylvania 15219.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e-1, *et seq*. ("Title VII").

13.     Defendant is an employer subject to the provisions of Title VII.

14.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because, at all times relevant hereto, Defendant conducted business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## ADMINISTRATIVE REMEDIES

15.     Plaintiff satisfied the notice and procedural requirements of Title VII by filing a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was contemporaneously cross-filed with the Pennsylvania Human Relations Commission ("PHRC") on November 26, 2024.

16.    Plaintiff filed an Amended Charge of Discrimination on May 21, 2025.

17.    On November 14, 2025, the EEOC issued a Notice of Rights letter.

18.    The action is timely brought as it is initiated within ninety (90) days of the Notice of Rights letter.

19.    Plaintiff exhausted all administrative remedies as to the allegations of this Complaint.

20.    In that Plaintiff's Charge, *as amended,* was dual-filed with the PHRC and has not been with the PHRC for more than one (1) year, she will seek to amend when her PHRA claims become ripe for disposition.


## FACTUAL BACKGROUND

### Jane Doe's Background

21.    Ms. Doe graduated from Duquesne University School of Law and maintains an active and unblemished Pennsylvania law license.

22.    Ms. Doe began working as an Associate in Blank Rome's Pittsburgh office in January 2022 and at hire was considered a "second year" associate under the firm's policies.

23.    Ms. Doe's tenure at Blank Rome was exemplary with excellent performance reviews over the course of more than three (3) years.

24.    She was a dedicated Associate and well-respected in the firm and specifically the Pittsburgh branch.

25.    Ms. Doe's focus was on general and employment litigation.

26.    As an Associate, Ms. Doe worked collaboratively with the firm's leadership in providing optimal client representation and successful legal outcomes.

### Associate A's Background

27.     Associate A graduated from the University of Pittsburgh School of Law in 2017.

28.     Associate A's background reflects a myriad of stints at various local law firms including Jackson Lewis, Cozen O'Connor, and Morgan Lewis.

29.     On information and belief, Associate A's background at those prior firms was not adequately vetted prior to his hiring by Blank Rome.

30.     On information and belief, both Cozen O'Connor and Morgan Lewis were unsatisfied with Associate A's work performance and behavior.

31.     Blank Rome interviewed Associate A in or around Fall 2023.

32.     Upon hiring, Associate A bragged to Ms. Doe and other coworkers that Blank Rome matched his compensation at Morgan Lewis and that he was Blank Rome's highest paid associate.

33.     He further disclosed that Blank Rome incentivized him and promised to elevate him to Partner by his eighth year.

34.     Though Associate A was not yet a Partner, he was considered Ms. Doe's superior and was requested to provide an evaluation of Ms. Doe's work performance during her mid-year review.

35.     Associate A boasted to Ms. Doe that everything he does is calculated; he is always one step ahead.

### Associate A's Violent History & Erratic Behaviors

36.     On information and belief, Associate A is allegedly married and has a history of alleged violence with the mother of his twin boys, with allegations of physical abuse necessitating the mother to relocate on at least one occasion.

37.     Almost immediately after his hiring, Associate A began exhibiting concerning behavior in the office.

38.     He would improperly comment on Ms. Doe's appearance and presence, noting that it was causing him to have "intrusive thoughts."

39.     He told Ms. Doe that she was the "Lebron James of the office," that it was an honor to work with her, and that he believed the two of them would someday run the firm.

40.     In addition to his inappropriate comments towards Ms. Doe, Associate A was, in general, exhibiting manic and disconcerting behaviors in the office.

41.     Multiple Blank Rome employees witnessed instances of Associate A manically pacing around the room, yelling, sweating, and gesturing in outbursts.

42.     He began sleeping on the floor of his office and wearing the same clothes the next day.

43.     On or around Thursday, May 23, 2024, Blank Rome's Office Administrator found Associate A sleeping on the floor of his office, causing him to jump up when she knocked on his door.  Associate A continued to work in the office for the rest of the day.

44.     The Office Administrator later informed Ms. Doe and another Professional Assistant at Blank Rome of what happened.

45.     Later that day, a Partner of Blank Rome ("Partner B") asked Ms. Doe if she knew what was going on with Associate A.

46.     Ms. Doe, having been assigned to work with Associate A on a case that was scheduled for an upcoming preliminary injunction hearing, told Partner B that there was no reason for him to work through the night.

47.     That same day, Partner B had a private conversation with Associate A, which led to Partner B removing him from a different matter.

48.     The two-day preliminary injunction hearing that both Ms. Doe and Associate A were assigned to, began on Wednesday, May 29, 2024.

49.     Once again, Associate A stayed at the office all night after the hearing.

50.     On Thursday, May 30, 2024, when Ms. Doe and others arrived at the office before the start of the second day of the hearing, Associate A was found pacing the office in a manic state, sweating and yelling directives.

51.     Associate A attended the second day of the preliminary injunction hearing while wearing the same clothes as the day before.

52.     Immediately following the conclusion of the preliminary injunction hearing, Ms. Doe expressed concern to Associate A that he was sleeping at the office, to which he responded, "Well, I don't hear you offering up your house for me to sleep at."

53.     Ms. Doe told him she was not comfortable with that comment and expressed the same to a co-worker who witnessed the exchange.

54.     On information and belief, after the preliminary injunction hearing, Partners noticed Associate A's poor performance in depositions and other legal matters and formally reported the same as they began removing him from assignments and reassigning the work to Ms. Doe.

55.     Despite the firm widely observing his manic behaviors, problematic comments in the workplace, and poor performance, Associate A continued working in this manner, unabated, and without any material consequence.

***Associate A's Sexual Assault of Ms. Doe***

56.     On Saturday, June 1, 2024, Ms. Doe attended a graduation party hosted by Partner B in honor of her child.

57.     Blank Rome's entire Pittsburgh office, including their families, was invited to attend the graduation party, which was held at a local establishment and had an open bar.

58.     Prior to the start of the graduation party, Ms. Doe missed two (2) calls from Associate A.  She did not answer, nor did she return his calls.

59.     When Associate A arrived at the party without his wife and children, he explained that he had called Ms. Doe to ask for her opinion on his outfit for the party.

60.      Following the graduation party, Ms. Doe and other employees of the firm went to Partner A's home to continue socializing.

61.     P.M., a friend of Partner A, was also present at their home.

62.     While at Partner A's home, Associate A sexually assaulted Ms. Doe.

63.     The assault and circumstances surrounding it were violent and alarming such that Partner A heard Ms. Doe yelling out for her.

64.     At that time, Partner A, Partner A's husband and P.M. entered the room and saw Ms. Doe lying partially unclothed and exposed on the floor with her head under the bedframe. Associate A was laying fully clothed on the floor near her with an erection.

65.     The assault prompted Partner A's husband to call 911.

66.     It also prompted a police presence and report.

67.     While Ms. Doe spoke with the police officer, Partner A called Partner C, Co-Chair of Blank Rome's Pittsburgh office, and notified Partner C of the assault.

68.     This phone call prompted Partner C to come to Partner A's home.

69.    Upon her arrival, Partner C advised Ms. Doe to go to the hospital to get evidence and "proof" of the assault.

70.    The detective permitted Associate A to leave in an Uber after questioning.

71.    Following the police report, Ms. Doe, accompanied by Partners A and C, went to Magee Women's Hospital, where Ms. Doe underwent examination, testing, and treatment.

72.    While on their way to the hospital, Partner C commented that, though it was no excuse for what had happened, she was concerned that something "mentally" was going on with Associate A.

73.    Partner C also stated that she had reached out to Partner D, the other Co-Chair of the Pittsburgh Office who had been directly supervising Associate A's work during the preliminary injunction hearing earlier in the week.  Partner C expressed that, during that conversation earlier in the week, she had raised concerns about Associate A's behavior to Partner D and that Partner D had assured her that Associate A was fine.

74.    Partner C further noted that the gravity of the situation warranted a report to Blank Rome's Chief Human Resources Officer, Beth Friel.

75.    Partner C explained that she herself would make the report to Ms. Friel and that Ms. Doe should otherwise keep the information confidential.

76.    That same day, Partner C indicated to Ms. Doe that the preliminary injunction hearing which was scheduled to continue the upcoming week would be managed by Associate A and that Partner C did not intend to tell Partner D what had occurred and that she intended for Associate A to go "back to work like nothing happened."  Partner C stated that Partner D would be told that Ms. Doe would be absent from the hearing due to an "emergency medical issue."

*The Report of the Sexual Assault to Blank Rome & Blank Rome's Response*

77.    On Sunday, June 2, 2024, less than twenty-four (24) hours after Associate A's assault of Ms. Doe, Ms. Friel spoke on the phone with Ms. Doe for 13 minutes.

78.    Ms. Friel assured Ms. Doe, who was still extremely upset and processing what had occurred the previous night, that the call was not a formal interview.

79.    During this call, Ms. Friel issued Ms. Doe the same directive that Partner C had given her the night before: that this was "confidential" and that Ms. Doe was not to share this information with anyone else at the firm.

80.    Blank Rome indicated that Ms. Doe could take three (3) days off work to recover, and Partner C informed Ms. Doe that the Partners on her cases would be told that she had an "emergency medical issue."

81.    On Monday, June 3, 2024, Ms. Doe awoke to pain and bruising on her left shoulder that resembled fingerprints, as though someone had held her down.

82.    That same day, Associate A was permitted to return to work as usual and without any consequences for his actions or the allegations.

83.    Blank Rome was, at the same time, allegedly attempting to obtain a copy of the police report—a report that could not be provided given the open and ongoing investigation.

84.    From the time of the assault and for a period of more than three (3) days thereafter, Blank Rome never conducted a formal interview of Ms. Doe.

85.    Only after Ms. Doe contacted Ms. Friel on June 5, 2024 and asked to speak with her, did Ms. Friel interview Ms. Doe about the events of June 1, 2024.

86.    Ms. Doe reiterated that Associate A had sexually assaulted her, action that was corroborated by the condition in which Ms. Doe was found, by the bruising on Ms. Doe's body (photos of which she sent to Blank Rome), and through the eyewitness recount of Partner A.

87.    Ms. Doe requested that either (1) Associate A be terminated or (2) that should Associate A remain employed, the following modifications be in place:

a)    An interim office schedule be put in place so that Ms. Doe and Associate A would not be in the office on the same day or at the same time;

b)    They are no longer staffed on the same cases; and

c)    Associate A receives mandatory counseling.

88.    Each of Ms. Doe's requests were reasonable under the circumstances, were not burdensome on the firm, and would have ensured her health and safety.  Yet, each request was denied.

89.    Ms. Friel also spoke with Partner A, who corroborated Ms. Doe's account of what transpired.

90.    In the course of interviewing employees, Ms. Friel described the circumstances to one employee as "embarrassing for everyone involved."

91.    Ms. Doe has never described this assault as "embarrassing."

92.    Ms. Doe was required to return to work on Friday, June 7, 2024, due to a mandatory in-person meeting.

93.    Despite understanding clearly that Ms. Doe wanted to remain separated from Associate A, no one at Blank Rome warned her that Associate A was going to be in the office that day.

94.     Ms. Doe immediately became terrified and sickened upon learning that Associate A was in the office at the same time.  It was clear that Ms. Friel had forgotten their prior conversation and failed to direct him to remain at home that day.

95.     Both Ms. Doe and Associate A were required to work remotely the following week.

96.     According to Ms. Friel, Blank Rome gave this directive in order to be "fair" to both parties.

97.     Notably, this directive came after Blank Rome allowed Associate A to work in the office with no limitations placed on him for the entire week immediately following the assault, during which time Ms. Doe was told to take time off and otherwise compelled to work remotely.

98.     Requiring Ms. Doe, the victim, to work remotely was isolating her and causing further harm to her mental and physical health—information she communicated to Ms. Friel.

99.     She further expressed to Ms. Friel that the lack of action by the firm and failure to make a determination on this issue was compounding the harm to Ms. Doe.

100.    On information and belief, Partner A addressed the firm's lack of action with Partner C, who responded that the firm was not going to take any action against Associate A and implied that if Partner A did not like that outcome, then Partner A should no longer be a Partner at the firm.

101.    The response of Blank Rome was to have both Ms. Doe and Associate A return to the office, to keep them both working on the same case that had preceded the sexual assault, and to simply suggest they avoid each other.

102.    Associate A did not adhere to this directive and, to the contrary, demonstrated an ongoing willingness to further intimidate Ms. Doe at every turn.

103.    On Friday, June 14, 2024, while both Ms. Doe and Associate A were attending the Allegheny County Bar Association's Bench Bar conference, Associate A and his wife chose to sit at the same table that Ms. Doe was occupying, in the seats immediately next to hers.

104.    This interaction occurred despite Ms. Friel's assurance during her June 7th phone call with Ms. Doe that Associate A was going to be instructed not to speak to Ms. Doe at the conference.

105.    On Saturday, June 15, 2024, Ms. Doe reported the incident at the Bench Bar conference to Ms. Friel, and Ms. Friel informed her of Blank Rome's final determination regarding the decision on what action—or, more appropriately, inaction—it would be taking regarding the assault.

106.    Blank Rome determined not to conduct an independent investigation, despite the fact that the perpetrator, victim, and witnesses were employees of the firm.

107.    Blank Rome failed to direct that independent review, despite the firm's personnel regularly observing erratic, concerning, and otherwise problematic behavior by Associate A.

108.    Blank Rome suggested it would not take any personnel action against Associate A absent Ms. Doe pressing criminal charges – action that is not required as a matter of law in discrimination and harassment claims.

109.    Blank Rome refused to place Ms. Doe and Associate A on opposing schedules for in-office workdays, nor would they be removing either Associate from the case on which they worked together on the preliminary injunction hearing.

110.    According to Ms. Friel, the reason for this refusal was because that case was "basically over" and she did not want to negatively impact Ms. Doe's career by removing her from the case.

111.    Though the preliminary injunction hearing had concluded, the case was far from being "over," as it still needed to be litigated.

112.    The conduct and inaction of Blank Rome, done in disregard of corroboration of the events by a Partner in the firm, both facilitated and exacerbated the harm to Ms. Doe.

113.    There was no disciplinary action taken with respect to Associate A.

114.    Such lack of action is clearly insufficient under the circumstances and in derogation of its obligations to Ms. Doe.

***Ms. Doe's Constructive Discharge***

115.    On November 26, 2024, Ms. Doe dual filed a Charge of Discrimination with the EEOC and PHRC, which was subsequently provided to Blank Rome.

116.    Again, Ms. Doe made a reasonable request for a work schedule to be enacted that would place her and Associate A in the firm's office on different days, so as to limit interactions between them and maintain her safety.

117.    Blank Rome denied her request as being against firm policy.

118.    Instead, Blank Rome permitted Associate A to work fully remotely for approximately six (6) weeks and never notified Ms. Doe of this accommodation to him so that she could return to the office free of fear for her safety.

119.    Instead, Ms. Doe was left to her own devices to monitor and ascertain the safety of the workplace.

120.    Upon learning that Associate A had not been in the Office for more than a month, on January 7, 2025, Ms. Doe went into the office believing she could safely work, only to have Associate A present himself, which left her with no alternative but to leave and work remotely for the remainder of the day.

121.    In addition, Associate A continued to communicate directly with Ms. Doe through January 2025, despite knowing he was not permitted to do so.

122.    Associate A was treated more favorably in the terms and conditions of his employment, as he was permitted to come and go freely from the office while Blank Rome knew or should have known of the fear that it caused and limitations that it placed on Ms. Doe's ability to be in the office.

123.    Associate A was permitted carte blanche authority in dictating the conditions of his employment with Blank Rome, while the same was not afforded to Ms. Doe.

124.    It was not until late February 2025, almost nine (9) months after the assault, that Blank Rome considered Ms. Doe's original proposal of rotating in-person office schedules, but it would only acquiesce to that request if Ms. Doe agreed to withdraw her EEOC and PHRC complaints.  To be sure, Blank Rome never implemented a rotating schedule.

125.    Thereafter, upon independent observation that Associate A was no longer coming into the office for weeks at a time, Ms. Doe requested that Associate A be required to work remotely, and if his attendance was required in the office, that she be provided with advance notice so that she could remain safe in a separate location.

126.    This request was also denied under the guise of being against firm policy, despite the fact that Associate A was not in the office for weeks at a time just a month earlier.

127.    During this time, while Blank Rome continually failed to implement any protections for Ms. Doe that would keep her safe from Associate A's presence in the office, Ms. Doe was assigned to a different preliminary injunction matter that would, at times, require her presence in the office.  In anticipation of this, Ms. Doe e-mailed Partner D, Co-Chair of the Pittsburgh Office, directly and asked for an accommodation that included being put on notice if

Associate A was going to be in the office during the duration of this assignment. Partner D responded that he provided Ms. Doe's request to Ms. Friel. Ms. Friel never responded or reached out to Ms. Doe.

128.    When Blank Rome finally proposed a potential rotating office schedule to Associate A, Associate A requested to work exclusively remotely instead, a request in contravention of the firm's asserted policies concerning in-office attendance as expressed to Ms. Doe. This same request was made by Ms. Doe weeks earlier and denied, but it was nevertheless granted for the assailant when he made the request.

129.    Every single request by Ms. Doe for a scheduling accommodation was denied and rebuffed under the guise of "firm policies," a limitation not similarly imposed on Associate A.

130.    On March 21, 2025, Ms. Doe resigned her employment with Blank Rome, having observed several months of more favorable treatment to her assailant all of which placed her in fear for her personal safety.

131.    Ms. Doe's resignation followed months of different and retaliatory treatment by Blank Rome including but not limited to:

    a.  requesting but being denied the ability to work on an opposite in-office schedule from Associate A;

    b.  having to perform work that Blank Rome refused to assign to Associate A;

    c.  enduring comments from Human Resources downplaying the severity of the sexual assault and harm caused to Ms. Doe;

    d.  being isolated from her colleagues due to an inability to work in the office free of concern for her safety;

e.  being denied compensation; and observing an unwillingness of Blank Rome to accommodate her very reasonable requests under the circumstances; and

f.  for such further reasons as will be established at time of trial.

132.  Blank Rome exhibited a preference toward the male associate to the detriment of the female associate from the outset, and throughout the remainder of her employment that differential treatment persisted to the detriment of Ms. Doe.

***Harm to Jane Doe***

133.  Ms. Doe complained of criminal conduct, sexual harassment and actual physical harm directed to her by Associate A.

134.  The failure of Blank Rome to take appropriate action in response to those complaints exacerbated and compounded the harm to Ms. Doe.

135.   The trauma of the event coupled with the absence of appropriate action to protect the employment environs by Blank Rome exacerbated the harm, anxiety, and fear caused to Ms. Doe and created an unsafe workspace**.**

136.  Following the sexual assault, Ms. Doe continued to be antagonized by Associate A through his presence in the office and the lack of sufficient action by Blank Rome to appropriately ensure no contact between them.

137.  Further harm was brought to Ms. Doe with Ms. Friel's lack of compassion and appreciation for the gravity of the assault – she suggested that Ms. Doe go to therapy to "get over this"—coupled with her routine gaslighting and failure to adequately accommodate Ms. Doe's very reasonable requests.

138.     Associate A was not required to remove himself from the workplace (but for the one week that both he and Ms. Doe were required to work remotely), revise his schedule, alter his case load, or suffer any other consequences as a result of his illegal conduct.

139.     Ms. Doe, on the other hand, faced routine scrutiny from Ms. Friel, had to remove herself physically from the workplace when she was feeling unsafe, had to manage caseloads in such a way that she was not assigned to the same matters as Associate A, and had to navigate away from him when he became physically intrusive in the workplace.

140.     Associate A continued to harm Ms. Doe by refusing to avoid her in the office and often interrupting meetings or interactions in such a way that Ms. Doe had to leave the room to protect herself and maintain her safety.

141.     Associate A would often physically position himself in such proximity to Ms. Doe to strike fear and terror in her.

142.     Associate A evidenced a brash willingness to engage in conduct that intimidated and caused Ms. Doe to experience fear and anxiety which conduct was not appropriately addressed by Blank Rome.

143.     The actions of Blank Rome in response to the initial complaints and ongoing fear expressed by Ms. Doe were at all times insufficient and/or inadequate responses to the complaints of Ms. Doe.

144.     While Associate A continued to remain unmonitored and unmoored in the workplace, Ms. Doe continued to endure a hostile work environment and feared for her personal safety.

145.     Further, Blank Rome's granting of Associate A's February 2025 request to work fully remote demonstrates that accommodations could have been provided to Ms. Doe at the time

of the assault and were not, causing Ms. Doe to be subjected to a hostile work environment – a condition that was entirely preventable.

## COUNT I

### SEX DISCRIMINATION (TITLE VII)

146.    The above paragraphs are incorporated as though each paragraph was set forth fully herein.

147.    Blank Rome, acting through its agents, servants, administrators, and employees, discriminated against Ms. Doe on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.S. § 2000e-1, et seq. ("Title VII").

148.    Blank Rome followed a practice of discrimination against Ms. Doe because of her sex, female, in violation of Title VII and in particular § 703 by failing to reasonably address the concerns of Ms. Doe in response to her report of sexual assault by Associate A.

149.    Following Ms. Doe's complaint of sexual assault, Blank Rome failed to take immediate and appropriate corrective action against Associate A.

150.    Further, Blank Rome engaged in a pattern and practice of treating the female victim less favorably than the male perpetrator in the terms and conditions of her employment.

151.    The wrongful conduct of Blank Rome included but is not limited to restricting Ms. Doe's access to the office by compelling her to work from home directly after the assault while allowing Associate A to come into the office and also by giving Associate A unfettered access to the office on any day and time such that if he was in the office, Ms. Doe either could not come into the office or would be forced to leave due to concerns over her physical safety.

152.    Because of Blank Rome's refusal to communicate Associate A's in-office status and because of its refusal to place Associate A and Ms. Doe on alternating in-office days, Ms. Doe was both compelled to be hypervigilant and restricted in her ability to work in office with her colleagues.

153.    As a consequence, Ms. Doe was restricted in the conduct of her professional duties, including but not limited to developing important professional relationships and advancing her career through those relationships as she had to remain isolated due to the threat to her safety.

154.    Moreover, because of confidentiality restrictions placed on Ms. Doe by Human Resources and the firm's Partners, she could not convey to attorneys the reasons for her extended in-office absence, all to her professional detriment.

155.    Differential treatment was also apparent in work assignments as Associate A's poor work performance resulted in the reassignment of his cases to Ms. Doe, making her responsible for rehabilitating the legal work her assailant failed to satisfactorily perform in the first instance.

156.    Blank Rome's determination to be "hands off" maintaining it was "treating them equally", in fact accomplished the opposite with the consequence of punishing the female victim to the benefit of her male assailant.

157.    As a consequence, Ms. Doe was repeatedly subjected to a severe, pervasive, and hostile environment that no reasonable person could be expected to endure.

158.    As a consequence, Ms. Doe was treated less favorably in the terms and conditions of her employment than the male assailant.

159.    Blank Rome's conduct as set forth herein constitutes a reckless or an intentional and willful violation of Title VII.

160.    As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe is deprived of wages and future job opportunities as the conduct of Blank Rome has substantially altered her career trajectory.

161.    In addition to the actual damages, the effects of the policies and practices of Blank Rome included humiliation and embarrassment among her colleagues and peers and discrimination in ways which jeopardized her career and deprived her of employment opportunities because of her protected class.

162.    As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe has suffered non-economic damages such as harm to reputation, mental anguish, pain, suffering, inconvenience, humiliation, and loss of enjoyment of life.

WHEREFORE, for the foregoing reasons, Plaintiff JANE DOE requests the Court grant relief prayed for hereinafter.


## COUNT II

### HOSTILE WORK ENVIRONMENT (TITLE VII)

163.    The above paragraphs are incorporated as though each paragraph was set forth fully herein.

164.    Blank Rome, acting through its agents, servants, administrators, and employees, discriminated against Ms. Doe on the basis of her sex in violation of Title VII.

165.    Blank Rome followed a practice of discrimination against Ms. Doe because of her sex, female, in violation of Title VII and in particular § 703 by fostering, promoting, and/or permitting a hostile work environment.

166.    Blank Rome was aware of the sexual harassment and failed to take immediate and appropriate corrective action against Associate A.

167.    By way of example, Blank Rome refused to participate in communications with Ms. Doe that would serve to provide her notice of Associate A's in-office schedule, including Associate A's extended absence from the firm's office, all of which would have permitted Ms. Doe to safely work in-office without fear for her safety.

168.    Blank Rome further refused to place Ms. Doe and Associate A on alternate workdays to eliminate the risk to Ms. Doe's safety; and only offered that alternative after she filed EEOC and PHRC complaints and with the requirement that she withdraw the complaints.

169.    Blank Rome did not adequately notify Associate A that he should not have interaction with Ms. Doe as, within days of the assault, he physically positioned himself at her table as a means of threatening her physical safety and exerting control over her.

170.    When Ms. Doe reported this conduct to Human Resources, Blank Rome failed to adequately address Associate A's threatening behavior.

171.    When Ms. Doe reported that Associate A was continuing to communicate with her following the assault, Blank Rome did not take adequate action to cease his behavior (as it occurred more than once and over the course of several months).

172.    The fact that Associate A was so blatantly willing to ignore any alleged instructions Blank Rome gave him concerning interactions with Ms. Doe further supports Ms. Doe's concern for her safety and further substantiates that his actions were continuing to create a hostile work environment that was unabated by the firm.

173.    Ms. Doe's continued reporting of Associate A's interactions (directly to HR and through the EEOC process) coupled with an inadequate response by Blank Rome evidences the

futility of Blank Rome's internal review and demonstrates its willingness to disregard the severity of Ms. Doe's concerns.

174.    Further, Ms. Friel's callous interactions with Ms. Doe following the sexual assault exacerbated the fear for her personal safety experienced by Ms. Doe.

175.    In addition, Blank Rome, upon receipt of the EEOC and PHRC Charges, had the response managed by one of its own attorneys—specifically one of the senior Partners of Ms. Doe's practice group who had assigned work to her.  It necessarily creates a hostile work environment when her adversarial in the discrimination filings is also one of her supervisors.

176.    As a consequence, Ms. Doe was repeatedly subjected to a severe and pervasive environment that no reasonable person could be expected to endure.  She was routinely and regularly faced with the proposition of having to interact with her sexual assailant at work.

177.    Blank Rome's suggestion that it would not take personnel action against Associate A absent the filing of criminal charges is inconsistent with its obligations as a matter of law.

178.    Blank Rome's conduct as set forth herein constitutes a reckless or an intentional and willful violation of Title VII.

179.    As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe is deprived of wages and future job opportunities and irreparable harm to her career trajectory.

180.    In addition to the actual damages, the effects of the policies and practices of Blank Rome included humiliation and embarrassment among her colleagues and peers and discrimination in ways which jeopardized her career and deprived her of employment opportunities because of her protected class.

181.    As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe has suffered non-economic damages such as harm to reputation, mental anguish, pain, suffering, inconvenience, humiliation, and loss of enjoyment of life.

WHEREFORE, for the foregoing reasons, Plaintiff JANE DOE requests the Court grant relief prayed for hereinafter.

## COUNT III

### RETALIATION (TITLE VII)

182.    The above paragraphs are incorporated as though each paragraph was set forth fully herein.

183.    Ms. Doe engaged in protected activity pursuant to Title VII by making an internal complaint of sex discrimination and sexual harassment to a supervisory employee.

184.    Ms. Doe reported the sexual assault and ongoing harassment to Ms. Friel between June 2, 2024, and March 31, 2025.

185.    Ms. Doe reported the sexual assault and ongoing harassment to Partner C on June 1, 2024, and Partner C also communicated this report to Ms. Friel.

186.    Ms. Doe also filed EEOC and PHRC Charges on November 26, 2024, while remaining employed with Blank Rome.

187.    Ms. Doe amended those Charges on May 21, 2025 to address, *inter alia*, retaliation that occurred following her original filing.

188.    Blank Rome engaged in unlawful retaliation following Ms. Doe's protected conduct.

189.     By way of example, following her protected conduct of complaining of sexual harassment in June 2024, Ms. Doe was directed by the firm to take time off and was further restricted in her in-office presence and in overall office interactions, causing her billable hours, which were previously on track and/or exceeding the prior year, to decline such that she received lower year-end compensation than prior years.

190.     Ms. Doe was penalized for absences necessitated by the wrongful conduct of Associate A and the failure of Blank Rome to appropriately and fairly respond to her complaints.

191.     In addition, following Ms. Doe's protected activity, Ms. Doe was assigned Associate A's work to complete when he either did not complete the work or performed it unsatisfactorily.

192.     It was clear from the actions of Blank Rome that it intended to protect Associate A to the detriment of the victim that he had sexually assaulted and other women employed by Blank Rome whose safety was compromised by Associate A's presence in the office.

193.     It was clear from the actions of Blank Rome that it did not intend to take disciplinary action against Associate A —nor did it attempt to conduct a meaningful investigation to determine if such action was necessary.

194.     Blank Rome purposefully perpetuated an environment that would force Ms. Doe to forfeit her legal rights or resign.

195.     Blank Rome's conduct as set forth herein constitutes a reckless or an intentional and willful violation of Title VII.

196.     As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe was subjected to retaliation following a complaint of sexual harassment directed at forcing her

constructive discharge and depriving her of wages and future job opportunities as the conduct of Blank Rome has substantially altered her career trajectory.

197.    As a direct and proximate result of Blank Rome's unlawful conduct, Ms. Doe has suffered non-economic damages such as harm to reputation, mental anguish, pain, suffering, inconvenience, humiliation, and loss of enjoyment of life.

WHEREFORE, for the foregoing reasons, Plaintiff JANE DOE requests the Court grant relief prayed for hereinafter.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff JANE DOE requests this Honorable Court grant the following relief against Defendant BLANK ROME, LLP:

a)     Compensation for past and future lost wages;

b)     Compensation for past and future lost benefits;

c)     General compensatory damages, including, but not necessarily limited to, physical harm, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and harm to reputation;

d)     Actual damages;

e)     Punitive damages as appropriate;

f)     Attorney fees, costs, and expenses;

g)     Interest; and

h)     Such further legal and equitable relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Date: <u>January 6, 2026</u>

Respectfully submitted,

<u>/s/ *Nicole Daller*</u>

Nicole Daller, Esq. (Pa. 312224)
Vicki K. Horne, Esq. (Pa. 36578)
Giulia R. Schaub, Esq. (Pa. 330375)

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
Phone: (412) 967-9400
Fax: (412) 967-0465
<u>ndaller@hornedaller.com</u>
<u>vkhorne@hornedaller.com</u>
<u>gschaub@hornedaller.com</u>

*Attorneys for Plaintiff*